## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

**EVANS EDWARDS,**                  )
    Plaintiff,                         )          Case No. 2:08cv00028
                                              )
v.                                                )          **REPORT AND**
                                              )          **RECOMMENDATION**
**MICHAEL J. ASTRUE,**              )
**Commissioner of Social Security,**   )          By: PAMELA MEADE SARGENT
    Defendant.                        )          UNITED STATES MAGISTRATE JUDGE

### I. *Background and Standard of Review*

The plaintiff, Evans Edwards, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

-1-

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Edwards filed his current applications for DIB and SSI on July 31, 2006, alleging disability as of October 7, 2005, due to bulging discs in the neck, headaches and constant pain, as well as problems causing the loss of use of his arms and hands, such as numbness and pain. (Record, ("R."), at 95-99, 106, 143, 272-74.) The claims were denied initially and upon reconsideration. (R. at 79-80, 82, 83-85, 277-79.) Edwards then requested a hearing before an administrative law judge, ("ALJ"). (R. at 76.) The ALJ held a hearing on October 25, 2007, at which Edwards testified and was represented by counsel. (R. at 38-73.)

By decision dated November 8, 2007, the ALJ denied Edwards's claims. (R. at 17-27.) The ALJ found that Edwards met the disability insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 19.) The ALJ also found that Edwards had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 19.) The ALJ determined that the medical evidence established that Edwards suffered from severe impairments, namely chronic cervical pain due to a motor vehicle accident, bilateral carpal tunnel syndrome, hearing loss, anxiety and depression; however, she found that Edwards did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) In addition, the ALJ found that Edwards

-2-

had the residual functional capacity to perform a limited range of light work.[1]  (R. at 23-24.)  Specifically, the ALJ found that Edwards was able to frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and that he could sit, stand or walk for about six hours in an eight-hour workday, with the option to alternate sitting and standing for brief periods throughout the course of the day.  (R. at 23-24.)  The ALJ further found that Edwards had no postural, communicative or visual limitations, but she did find that, due to hearing loss, Edwards would not be able to work with dangerous machinery or perform work tasks that required the use of a telephone.  (R. at 24.)  The ALJ also determined that Edwards was limited to only occasional fine manipulative operations, that he could perform reaching or handling for only two-thirds of an eight-hour workday and that he was prohibited from performing overhead lifting or reaching.  (R. at 24.)  The ALJ also found that, due to mild to moderate reductions in maintaining concentration and social functioning, Edwards was limited to simple, noncomplex tasks that did not require interaction with co-workers or require him to work with the public.  (R. at 24.)  Thus, the ALJ found that Edwards was unable to perform any of his past relevant work.  (R. at 26.)  Based upon Edwards's age, education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national economy that he could perform, including those of a laundry worker, a laundry folder and a garment folder.  (R. at 26-27.)  Therefore, the ALJ concluded that Edwards was not under a disability as defined in the Act and was not entitled to DIB or SSI benefits.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If someone can perform light work, he also can perform sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

-3-

After the ALJ issued her decision, Edwards pursued his administrative appeals, (R. at 12-13), but the Appeals Council denied his request for review. (R. at 6-9.) Edwards then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). This case is before the court on Edwards's motion for summary judgment, which was filed December 31, 2008, and on the Commissioner's motion for summary judgment, which was filed on January 27, 2009.

## II. Facts

Edwards was born in 1970, (R. at 95, 272), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). According to the record, Edwards has a ninth-grade education with special education instruction and past work as a foreman in the coal mining industry, an equipment operator, a mine equipment mechanic, a truck mechanic and a truck driver. (R. at 108, 112.)

At the hearing on October 25, 2007, Edwards's counsel explained that, as the result of a 2005 motor vehicle accident, Edwards began experiencing significant cervical pain, cervical radiculopathy and headaches. (R. at 41.) Counsel further explained that medical testing revealed disc difficulties in the cervical area and bilateral carpal tunnel syndrome. (R. at 41.) Edwards's counsel stated that the pain caused Edwards to develop anxiety, panic attacks and depression. (R. at 42.)

Edwards testified that he injured his neck in the motor vehicle accident, noting that he had not undergone surgery to address the problem. (R. at 43-44.) According

-4-

to Edwards, he received steroid injections and attended physical therapy to treat his pain, but he indicated that the treatment did not help his condition. (R. at 44-45.) He did acknowledge that the medications Vicodin and Vicoprofen provided some pain relief. (R. at 45.) Edwards testified that he tried to refrain from taking pain medication frequently because it was addictive. (R. at 45.) He also testified that, since being on the medication, his ability to get around his house and perform certain chores had improved. (R. at 46.) In fact, Edwards remarked that he was able to go outside and walk around, noting that, on a good day, he was able to mow part of his yard. (R. at 46.) However, Edwards explained that such activity generally caused him to be "down for two days" following the activity. (R. at 46.) Edwards testified that he did not participate in other activities, stating that he did not go places where there were large crowds due to panic attacks. (R. at 46.) Edwards further testified that he took Prozac to treat his depression, commenting that he would not be able to deal with his condition without the medication. (R. at 47.) Despite continued bouts with depression, Edwards admitted that he was doing a lot better. (R. at 47.)

Edwards testified that he had carpal tunnel syndrome, but stated he could not have surgery to address the condition because he had no health insurance. (R. at 47-48.) He also indicated that he suffered from neck and back pain that radiated into his shoulders and arms, and he explained that he experienced frequent numbness in his hands, which rendered his hands useless. (R. at 48, 57.) Edwards testified that he could sit for only 30 to 45 minutes at a time before having to change positions. (R. at 49.) Edwards explained that if he worked outside or assisted with household chores he would not be able to do anything for the next two days. (R. at 49-50.) Edwards also claimed that, due to his pain, he was unable to completely turn his head from side

-5-

to side without moving his entire upper body.  (R. at 57-58.)  He testified that he suffered from headaches approximately four days per week and which lasted from 30 minutes to eight hours at a time.  (R. at 58.)  Edwards indicated that he suffered from panic attacks, sleep difficulties and problems with concentration and focus.  (R. at 60-61.)

James Williams, a vocational expert, also was present and testified at Edwards's hearing.  (R. at 62-72.)  Williams identified Edwards's past work as a coal mining foreman as skilled, medium[2] to heavy[3] work, and his past jobs as an equipment operator, a mine equipment mechanic and a truck mechanic were all identified as skilled, medium work.  (R. at 66.)  Edwards's work as a truck driver was identified as unskilled, medium work.  (R. at 67.)  Williams was asked to consider an individual of Edwards's age, education and work experience who had the residual functional capacity to perform light work that did not require more than occasional use of his hands for fine manipulation and that did not require reaching more than two-thirds of the workday and who was prohibited from reaching or lifting overhead.  (R. at 67.)  In addition, such an individual would have a moderate reduction in his ability to concentrate due to pain, and the individual would be limited to simple, noncomplex tasks because of depression.  (R. at 67.)  The individual would be permitted to change postural positions from sitting to standing frequently throughout the day for brief time

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If an individual can do medium work, he also can do sedentary and light work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

[3]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds.  If someone can do heavy work, he also can do medium, light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008).

-6-

periods.  (R. at 67.)  The individual would be best suited for work away from the public and not in close proximity to other people.  (R. at 67.)  Lastly, because of a hearing impairment, the individual would be prohibited from working in close proximity to dangerous machinery and occupations requiring the use of telephones. (R. at 68.) Williams testified that there were light jobs existing in significant numbers that such an individual could perform, including jobs as a laundry laborer and a laundry folder.  (R. at 68-69.)

The ALJ next asked Williams to consider the same light work limitations as noted previously, as well as the limitations set forth in Exhibit 12F.[4]  (R. at 71.)  In considering the limitations noted in Exhibit 12F, Williams commented that certain limitations may conflict with one another.  (R. at 72.)  However, based upon the limitations as stated, Williams noted that such limitations would "take the individual into an unproductive work week." (R. at 72.) Edwards's counsel then asked Williams to consider an individual whose concentration and persistence was markedly inadequate to make even simple, work-related decisions. (R. at 72.)  Williams opined that such limitations would impact one's ability to perform unskilled work if the limitation was present for at least 20 to 30 percent of a normal workday.  (R. at 72.)

In rendering her decision, the ALJ reviewed medical records from Wellmont Bristol Regional Medical Center; Highlands Neurosurgery, P.C.; VanDyke Chiropractic, P.C.; Dr. Richard M. Surrusco, M.D., a state agency physician; Stone Mountain Health Services; Julie Jennings, Ph.D., a state agency psychologist; Dr.

---

[4]Exhibit 12F is a Medical Assessment Of Ability To Do Work-Related Activities (Mental), which was completed by William Hamil, M.Ed., on September 22, 2007.  (R. at 240-42.)

Robert O. McGuffin, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; William Hamil, M.Ed., a licensed senior psychological examiner; Dr. Patricia Vanover, M.D.; and Crystal Burke, a licensed clinical social worker, ("LCSW").

Edwards was treated at VanDyke Chiropractic, P.C., from August 7, 2003, to June 8, 2007, by Bradley VanDyke, D.C. (R. at 175-80, 257.) Although the treatment notes from these visits are largely illegible, it is readily apparent that Edwards was consistently treated for neck pain, back pain and muscle spasms, as well as general aches and tenderness. (R. at 175-80, 257.) On November 7, 2005, VanDyke ordered an MRI, which revealed spondylotic disc bulges with uncinate spurring from the C4-5 though the C6-7 levels of the cervical spine. (R. at 181.) The MRI also showed mild foraminal encroachment on the left at the C4-5 level and moderate encroachment at the C5-6 level. (R. at 181.) Mild encroachment also was observed on the right at the C5-6 level. (R. at 181.) There was no evidence of canal stenosis. (R. at 181.) Bilateral uncinate spurs were seen at the C3-4 level without foraminal encroachment, and there was a small spondylotic disc bulge at the C6-7 level. (R. at 181-82.)

Edwards was treated at Highlands Neurosurgery, P.C., from November 16, 2005, to January 6, 2006. (R. at 168-74.) Edwards presented to Dr. J. Travis Burt, M.D., on November 16, 2005, with chief complaints of headaches and neck pain. (R. at 174.) Edwards reported that he had experienced headaches and cervical pain since a motor vehicle accident the previous month. (R. at 174.) He also reported numbness and tingling in both hands, as well as fatigue and weakness in the upper extremities. (R. at 174.) Upon examination, Edwards was alert, oriented and did not appear to be

-8-

in any acute distress. (R. at 174.) He exhibited a full range of motion of the cervical spine, and his range of motion in the shoulders appeared to be appropriate. (R. at 174.) Palpation over the posterior cervical region revealed some mild discomfort bilaterally, and the trapezius regions were slightly tender. (R. at 174.) Neurologically, Edwards appeared to be grossly intact, and the overall examination yielded normal results. (R. at 174.) Dr. Burt noted that the November 2005 MRI revealed degenerative changes at the C4-5, C5-6 and C6-7 levels of the cervical spine; however, no obvious critical stenosis or disc herniation was appreciated. (R. at 174.) The MRI did show some mild spurring in the previously mentioned areas. (R. at 174.) Dr. Burt recommended that Edwards undergo a bilateral upper extremity electromyogram, ("EMG"), as well as an injection for pain relief. (R. at 174.)

Dr. Burt referred Edwards to Dr. John Marshall, M.D., who performed the nerve conduction studies on November 28, 2005. (R. at 170-73.) The findings suggested probable bilateral median mononeuropathy at the wrist versus median nerve injury. (R. at 170.) There were no findings to suggest cervical radiculopathy brachial plexopathy or a more diffuse peripheral polyneuropathy. (R. at 170.) Dr. Marshall recommended a clinical correlation. (R. at 170.)

On December 1, 2005, Edwards presented to Wellmont Bristol Regional Medical Center at the recommendation of Dr. Burt, where he was treated by Dr. William M. Platt, M.D. (R. at 166-67.) Dr. Platt performed a left C6-7 interlaminar epidural injection to address Edwards's back pain. (R. at 166.) Dr. Platt noted that Edwards tolerated the procedure very well. (R. at 166.)

Edwards returned to Dr. Burt on December 13, 2005, complaining of cervical pain. (R. at 169.) Specifically, he complained of continued posterior cervical pain radiating into his shoulders, more on the left than the right. (R. at 169.) Edwards reported that the epidural injection did not improve his symptoms, and he noted that movement exacerbated his pain. (R. at 169.) Edwards denied any upper extremity pain. (R. at 169.) He also noted that, at the time of this visit, he was treating his symptoms with Ultram and Norflex. (R. at 169.) Upon examination, Edwards exhibited tenderness in the posterior cervical region throughout the trapezius muscles bilaterally, with a slight spasm appreciated. (R. at 169.) Edwards's range of motion with flexion and extension was decreased, but his range of motion in the shoulders was good bilaterally, with no signs of impingement. (R. at 169.) The remaining physical examination was unremarkable. (R. at 169.) Dr. Burt diagnosed cervical strain and posterior cervical pain due to a motor vehicle accident, as well as multiple levels of degenerative changes and complaints of headaches. (R. at 169.) Dr. Burt encouraged Edwards to continue conservative treatment, noting that some of his pain was more muscular in nature, which was consistent with a cervical strain. (R. at 169.) Physical therapy was arranged, and he was prescribed a Medrol Dosepak, Robaxin, ibuprofen and Vicodin. (R. at 169.) It was further recommended that Edwards remain off work until his next office visit. (R. at 169.)

Edwards returned for a follow-up visit with Dr. Burt on January 6, 2006. (R. at 168.) Edwards again exhibited some mild tenderness over the posterior cervical region throughout the trapezius regions bilaterally, with a slight spasm noted. (R. at 168.) Edwards's range of motion of the cervical spine was slightly decreased with flexion and extension due to some mild pain. (R. at 168.) He was neurologically

intact. (R. at 168.) Dr. Burt again diagnosed cervical strain due to a motor vehicle accident and continued headaches. (R. at 168.) Dr. Burt opined that surgical intervention was not necessary. (R. at 168.) Due to his lack of improvement with conservative treatment, Dr. Burt recommended that he follow up with Dr. Platt or Dr. Marshall for medical management of his cervical pain syndrome. (R. at 168.) He was prescribed Robaxin and Vicodin. (R. at 168.)

Edwards sought treatment at Stone Mountain Health Services, ("Stone Mountain"), from January 18, 2005, to July 25, 2007. (R. at 190-211, 259-68.) From January 2005 to December 2006, Edwards was treated primarily by Wilma Deel, FNP, and Dr. Sharat K. Narayanan, M.D. (R. at 190-211.) Edwards presented on January 18, 2005, for a follow-up appointment regarding his hypothyroidism, irritable bowel syndrome, ("IBS"), and anxiety. (R. at 202.) It was noted that Edwards's IBS symptoms and anxiety were controlled with medication. (R. at 202.) Edwards specifically denied any feelings of depression. (R. at 202.) Deel diagnosed hypothyroidism, hyperlipidemia, IBS and anxiety. (R. at 202.) Edwards was continued on Synthroid, Bentyl and Buspar, and he was encouraged exercise, diet and stop smoking. (R. at 202.) Edwards returned on June 7, 2005, for a follow-up appointment and for medication refills. (R. at 201.) Edwards reported no complaints, and it was noted that his IBS and anxiety continued to be controlled with medication. (R. at 201.) The diagnoses and treatment plan were essentially unchanged. (R. at 201.)

Edwards presented to Stone Mountain on October 21, 2005, for a follow-up appointment and complaints of back pain. (R. at 199-200.) Edwards reported thoracic spinal pain, which he rated a six on a 10-point scale. (R. at 199.) An examination of

-11-

the thoracic spine showed minimal spinal tenderness between the thoracolumbar junction and the spine of the scapula. (R. at 199.) Dr. Narayanan diagnosed hypothyroidism, hyperlipidemia and thoracic spinal pain. (R. at 200.) Edwards was advised to treat his pain with Motrin. (R. at 200.) Edwards returned on June 29, 2006, complaining of cervical pain. (R. at 197-98.) He reported increased pain with any activity. (R. at 197.) Edwards was diagnosed with hypothyroidism, gastroesophageal reflux disease, ("GERD"), hyperlipidemia, post-traumatic chronic cervical and thoracic pain, increased liver function tests, IBS, anxiety and depression. (R. at 198.) Edwards reported that he tolerated the pain, noting that it was relieved with rest, heat application and Motrin. (R. at 198.) Coping and relaxation mechanisms were discussed with Edwards, and he was prescribed Wellbutrin to treat his depression and anxiety. (R. at 198.) When Edwards returned on July 28, 2006, for a follow-up visit, his condition was relatively unchanged. (R. at 195-96.) He reported that his chronic cervical and thoracic pain was almost unbearable with any increased activity. (R. at 195.) Edwards indicated that the Wellbutrin actually made him feel worse. (R. at 195.) Edwards exhibited cervical and thoracic paraspinal tenderness, and he had a flat affect. (R. at 196.)

Edwards presented to Stone Mountain on September 29, 2006, and continued to report upper back and cervical pain. (R. at 193.) He rated his pain as a four on a 10-point scale, noting that he was never pain free and that his pain worsened with increased activity. (R. at 193.) Edwards reported intermittent paraesthesia of both hands, and he stated that he experienced intermittent depressed moods. (R. at 193.) Edwards indicated that he tried to keep a positive outlook, and he denied any suicidal ideations. (R. at 193.) A physical examination revealed findings similar to those noted

-12-

during Edwards's previous visits. (R. at 194.) Deel diagnosed hypertriglyceridemia, hypothyroidism, chronic post-traumtic thoracic and cervical pain, anxiety disorder, IBS and musculoskeletal pain. (R. at 194.) Edwards was continued on the same treatment regimen, with the addition of Darvacet, and physical therapy modalities were discussed. (R. at 194.) Edwards presented for a follow-up appointment on December 28, 2006, complaining of the same ailments. (R. at 190–92.) He noted that his cervical and thoracic pain radiated into his shoulders and down his arms. (R. at 190.) While the treatment notes indicate findings nearly identical to his previous visits, it should be noted that, during this particular visit, Edwards was referred to a counselor and was prescribed Prozac to treat his depression and anxiety. (R. at 192.)

On January 26, 2007, when Edwards presented to Stone Mountain, he was treated by Dr. Patricia Vanover, M.D. (R. at 262.) Deel referred Edwards to Dr. Vanover for a pain evaluation. (R. at 262.) Edwards reported that Vicodin that he had taken in the past was effective in controlling his pain, but his current prescription for Darvocet was not effective. (R. at 262.) Edwards also explained that ibuprofen controlled his pain; however, he expressed concerns about taking too much of the medication. (R. at 262.) A physical examination of the neck revealed marked tenderness of the paracervical muscles, as well as a possible marked decrease in Edwards's range of motion in the neck, secondary to pain. (R. at 262.) Dr. Vanover also noted tenderness in the upper thoracic back area that extended out to the shoulders. (R. at 262.) Edwards's range of motion of his arms was restricted, secondary to wrist pain. (R. at 262.) Dr. Vanover concluded that Edwards suffered from chronic cervical pain and advised him to continue his treatment regimen. (R. at 262.) Specifically, Dr. Vanover instructed Edwards to continue taking ibuprofen for

-13-

control of moderate pain, but suggested that he take Vicoprofen for severe pain. (R. at 262.) Edwards also was advised to avoid lifting, straining, pushing and pulling, and it was recommended that he use heat treatments for his upper thoracic area and neck. (R. at 262.)

On February 28, 2007, Edwards presented to Stone Mountain for a behavioral health consultation with Crystal Burke, LCSW. (R. at 266.) Edwards reported that, prior to the October 2005 motor vehicle accident, he was very active, but explained that, after the accident, he had been unable to return to work or complete simple activities. (R. at 266.) Edwards also reported problems such as depression, isolation and frequent crying episodes. (R. at 266.) He indicated that he had been prescribed Prozac and Buspar to treat his conditions, noting that the Prozac was not helping his most severe depressive symptoms. (R. at 266.) Edwards reported several financial stressors, as well as a suicide attempt that occurred at age 16. (R. at 266.) However, at the time of the consultation, he denied any suicidal ideations. (R. at 266.) Burke noted that Edwards presented with a depressed mood and was tearful at times. (R. at 266.) She further remarked that his thought content was noted for depression, but was free of psychotic processes. (R. at 266.) Burke indicated that Edwards appeared to be experiencing symptoms characteristic of a major depressive disorder, noting that he had multiple situational and family stressors. (R. at 266.) Coping strategies for his stressors and symptoms were discussed, and Edwards was permitted to verbally vent. (R. at 266.)

Edwards was again treated by Dr. Vanover on March 27, 2007. (R. at 261.) He reported that he was doing fairly well and explained that, although he continued to

-14-

experience pain, he was doing much better, due in large part, to the Vicoprofen prescription. (R. at 261.) Edwards reported that he continued to be quite anxious, but indicated that he was coping much better. (R. at 261.) Upon examination, Dr. Vanover noted that there was marked tenderness of the cervical musculature and a decreased range of motion. (R. at 261.) Dr. Vanover's diagnosed chronic anxiety disorder, hypothyroidism, chronic cervical pain, depression and benign prostatic hypertrophy. (R. at 261.) Edwards was continued on the same medications. (R. at 261.)

Edwards returned to Stone Mountain on April 4, 2007, for behavioral health treatment. (R. at 265.) He reported a significant increase in stress due to a verbal confrontation with his brother. (R. at 265.) He also reported continued chronic pain, as well as daily depression, which he attributed to pain and "being shut in the home." (R. at 265.) Burke noted that Edwards was alert and oriented and his memory appeared to be intact. (R. at 265.) She also noted that his mood appeared to be depressed with a flat affect and that he was rather anxious at times. (R. at 265.) In Burke's assessment, she indicated that Edwards continued to report anxiety and depressive symptoms, as well as problems coping with chronic pain and financial stressors. (R. at 265.) Edwards's family stress was discussed, he was allowed to verbally vent and coping strategies and relaxation techniques were encouraged. (R. at 265.) Edwards saw Burke again on May 2, 2007, and reported that he felt something "pop" in his back when he was out in his yard. (R. at 268.) He noted that he had experienced back problems for years, but stated that since the incident, his pain had worsened. (R. at 268.) Edwards reported increased stress and stated that he had isolated himself more, commenting that he had no motivation to do simple tasks

-15-

around the home. (R. at 268.) Edwards denied any suicidal or homicidal ideations. (R. at 268.) Burke observed Edwards to be alert and oriented, with a depressed mood and normal thoughts. (R. at 268.) Burke noted that Edwards continued to report and exhibit some depressive symptoms and chronic pain. (R. at 268.) Edwards discussed family and financial stressors and was allowed to verbally vent. (R. at 268.)

Edwards presented to Dr. Vanover at Stone Mountain on June 25, 2007. (R. at 260.) He again indicated that Vicoprofen had helped his pain, and he reported that he was able to attend to his activities of daily living and chores without undue difficulty. (R. at 260.) As such, he was much easier to get along with and his life was more pleasant. (R. at 260.) Edwards also reported that he was experiencing much less depression. (R. at 260.) A physical examination revealed tenderness in the paracervical muscles with a decreased range of motion of the neck. (R. at 260.) Dr. Vanover concluded that Edwards suffered from chronic cervical pain, hypothyroidism, hyperlipidemia and chronic depression. (R. at 260.)

Edwards saw Burke on July 25, 2007, for a follow-up behavioral health consultation. (R. at 267.) Edwards reported financial and family stressors, as well as problems dealing with large crowds. (R. at 267.) He also reported improved pain control due to his medications. (R. at 267.) However, Edwards indicated that he was very limited as to what he was able to do. (R. at 267.) He reported sleep problems and denied any suicidal or homicidal ideations. (R. at 267.) Burke noted that Edwards was alert and oriented and that his memory was intact. (R. at 267.) Edwards's mood appeared to be mildly depressed with a congruent affect. (R. at 267.) Burke found that Edwards related well with his thoughts and speech. (R. at 267.) Once again, Edwards

-16-

reported and exhibited depressive symptoms and significant situational stressors. (R. at 267.) Edwards was allowed to verbally vent, he discussed his stressors and relaxation techniques were encouraged. (R. at 267.)

On March 15, 2006, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Edwards had a nonsevere medical impairment. (R. at 212-24.) Specifically, Jennings determined that Edwards suffered from an anxiety disorder, not otherwise specified, noting that the medically determinable impairment did not precisely satisfy the required diagnostic criteria. (R. at 217.) Jennings found that Edwards was mildly limited in his activities of daily living and in his ability to maintain social functioning. (R. at 222.) However, Jennings placed no limitations on Edwards's ability to maintain concentration, persistence or pace. (R. at 222.) Jennings also indicated that Edwards had not experienced any episodes of decompensation. (R. at 222.) She further found that Edwards's mental allegations were only partially credible. (R. at 224.) This assessment was affirmed by E. Hugh Tenison, Ph.D., another state agency psychologist, on February 5, 2007. (R. at 212.)

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity assessment, ("PRFC"), March 14, 2006, finding that Edwards could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for about six hours in a typical eight-hour workday and sit for about six hours in a typical eight-hour workday. (R. at 225-31.) Dr. Surrusco also found that Edwards was limited in his ability to push and/or pull with his upper extremities. (R. at 226.) He

-17-

determined that Edwards could only occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 227.) In addition, Dr. Surrusco indicated that Edwards was limited in his ability to reach in all directions, including overhead. (R. at 227.) However, no additional manipulative limitations were reported. (R. at 227.) Dr. Surrusco noted no visual, communicative or environmental limitations. (R. at 227-28.) Dr. Surrusco also found Edwards's allegations to be only partially credible. (R. at 231.) On February 6, 2007, Dr. Surrusco's findings were affirmed by Dr. Robert O. McGuffin, M.D., another state agency physician. (R. at 229, 231.)

Dr. Surrusco completed another PRFC on September 18, 2006, noting findings nearly identical to those contained in his March 2006 assessment. (R. at 184-89.) However, in his September 2006 assessment, Dr. Surrusco noted no postural limitations. (R. at 186.)

William Hamil, M.Ed., a licensed senior psychological examiner, performed a psychological evaluation on September 22, 2007. (R. at 234-39.) Edwards reported panic attacks and depression, noting that he experienced feelings of nervousness, worthlessness, uselessness, anxiousness and guilt. (R. at 235, 237.) In addition, he stated that he thought about suicide daily, but explained that he would not commit suicide "because [he] want[ed] to go to Heaven." (R. at 235.) Edwards indicated that he received outpatient mental heath treatment from age 15 to 18 because of a suicide attempt, in which he tried to hang himself. (R. at 236.) He also reported that, since 2006, he had been receiving mental health treatment at Stone Mountain. (R. at 236.) Hamil noted that Edwards did not appear to be exaggerating symptoms for the purpose of gaining disability benefits. (R. at 236.) He further noted that Edwards's mood was

-18-

generally depressed and, at the time of the evaluation, was nervous. (R. at 236.) Hamil found Edwards's affect to be appropriate to the situation. (R. at 236.) No looseness of associations or other symptoms of formal thought disorder were present. (R. at 236.) Edwards reported suicidal ideations without plans, and he denied homicidal ideations, obsessions and phobias. (R. at 236-37.) No hallucinations or delusions were elicited. (R. at 237.) Hamil noted that Edwards was alert and oriented to person and situation; however, he found Edwards to be mildly disoriented as to time and place. (R. at 237.) Hamil found Edwards's ability to concentrate and maintain attention to be limited, but noted that his short-term memory appeared to be generally intact. (R. at 237.) Hamil opined that Edwards's intelligence was probably in the low average range, and he found Edwards's insight and judgment to be adequate. (R. at 237.)

According to Hamil, during the psychological testing, Edwards appeared to put forth a consistently good effort, noting that all test results should be considered valid. (R. at 237.) The Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), test was administered, and Edwards obtained a verbal IQ score of 88, a performance IQ score of 91 and a full-scale IQ score of 89. (R. at 237.) Hamil explained that the disparity between Edwards's verbal and performance abilities was statistically significant, indicating that it reflected superior nonverbal and fluid reasoning relative to acquired verbal-related knowledge and verbal reasoning. (R. at 237.)

Hamil noted that Edwards related well during the interview. (R. at 239.) Nonetheless, Hamil found that, at the time of the examination, Edwards's interpersonal skills were poor due to panic. (R. at 239.) Hamil determined that

-19-

Edwards was capable of making adequate judgments in managing his own funds, stating that he did not present any psychological limitations that would make him incompetent in that regard. (R. at 239.)

In assessing Edwards's ability to perform work-related activities, Hamil indicated that Edwards exhibited a poor energy level. (R. at 239.) Hamil found that Edwards did not appear to be limited in his ability to understand, but explained that Edwards was moderately limited in his ability to remember general items and concepts because of apathy, anxiety and stress sensitivity. (R. at 239.) He further found that while Edwards was able to comprehend, it would be unreasonable to expect him to be able to follow more than simple job instructions and perform more than simple and repetitive tasks because of his memory problems. (R. at 239.)

Hamil determined that Edwards's concentration and persistence were markedly inadequate to meet the demands of more than simple work-related decisions, which was attributed to Edwards's indecisiveness, panic and apathy. (R. at 239.) Edwards also exhibited a markedly unsatisfactory ability to interact with others. (R. at 239.) In particular, Hamil noted that Edwards would have a limited ability to accept instructions from supervisors and interact with co-workers and the public appropriately due to his panic attacks and feelings of guilt and worthlessness. (R. at 239.) Hamil found that Edwards did not possess the full ability to manage his own hygiene, and he also found that Edwards would, at times, need assistance in performing certain activities of daily living. (R. at 239.) In addition, as a result of panic attacks, stress sensitivity and apathy, Edwards was found to be extremely limited in his ability to do the following: deal with the usual stress encountered in

-20-

competitive work; adapt to changes in the workplace; be aware of normal hazards; or take appropriate precaution. (R. at 239.) Hamil also concluded that Edwards's anxiety, mood and physical problems might extremely detract from his ability to do the following activities: maintain regular attendance; perform work activities on a consistent basis; perform work activities without special/additional supervision and; meet an employment schedule, i.e. completing a normal workday/workweek without interruption. (R. at 239.)

Hamil found Edwards's prognosis to be guarded, opining that mental health counseling and medication management by a psychiatrist would be in his best interests. (R. at 239.) Hamil diagnosed Edwards with panic disorder with agoraphobia, depressive disorder, not otherwise specified, asthma, hypothyroidism, hypercholesterolemia, IBS and multiple herniated discs. (R. at 239.) He also determined that Edwards isolated himself, avoided others and was dependent upon his spouse. (R. at 239.) Hamil concluded that Edwards had a then-current Global Assessment of Functioning,[5] ("GAF"), score of 40.[6] (R. at 239.)

Hamil also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), finding that Edwards was markedly limited in his ability to understand, remember and carry out complex instructions and in his ability to make

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6]A GAF score of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV at 32.

judgments on complex work-related decisions. (R. at 240-42.) Hamil noted no limitations in Edwards's ability to understand, remember and carry out simple instructions or his ability to make judgments on simple work-related decisions. (R. at 240.) Hamil found Edwards to be extremely limited in his ability to interact appropriately with supervisors, co-workers and the public. (R. at 241.) He further found that Edwards was extremely limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 241.) Hamil noted that Edwards possessed the ability to manage his benefits in his own best interests. (R. at 242.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

-22-

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 8, 2007, the ALJ denied Edwards's claims. (R. at 17-27.) The ALJ found that Edwards met the disability insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 19.) The ALJ also found that Edwards had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 19.) The ALJ determined that the medical evidence established that Edwards suffered from severe impairments, namely chronic cervical pain due to a motor vehicle accident, bilateral carpal tunnel syndrome, hearing loss, anxiety and depression; however, she found that Edwards did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) In addition, the ALJ found that Edwards had the residual functional capacity to perform a limited range of light work. (R. at 23-24.) Specifically, the ALJ found that Edwards was able to frequently lift and/or carry items weighing up to 10 pounds, occasionally lift and/or carry items weighing up to 20 pounds and that he could sit, stand or walk for about six hours in an eight-hour workday, with the option to alternate sitting and standing for brief periods throughout the course of the day. (R. at 23-24.) The ALJ further found that Edwards

-23-

had no postural, communicative or visual limitations, but he did find that, due to hearing loss, Edwards would not be able to work with dangerous machinery or perform work tasks that required the use of a telephone. (R. at 24.) The ALJ also determined that Edwards was limited to only occasional fine manipulative operations, that he could perform reaching or handling for only two-thirds of an eight-hour workday and that he was prohibited from performing overhead lifting or reaching. (R. at 24.) The ALJ also found that, due to mild to moderate reductions in maintaining concentration and social functioning, Edwards was limited to simple, noncomplex tasks that did not require interaction with co-workers or require him to work with the public. (R. at 24.) Thus, the ALJ found that Edwards was unable to perform any of his past relevant work. (R. at 26.) Based upon Edwards's age, education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national economy that he could perform, including those of a laundry worker, a laundry folder and a garment folder. (R. at 26-27.) Therefore, the ALJ concluded that Edwards was not under a disability as defined in the Act and that he was not entitled to DIB or SSI benefits. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

Edwards argues that the ALJ erred by failing to adhere to the treating physician rule and accord controlling weight to the opinion of Dr. Vanover. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-9.) Edwards also argues that the ALJ erred by failing to give full consideration to the findings of Hamil, who assessed Edwards's mental impairments and their impact on his ability to work. (Plaintiff's Brief at 9-10.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

The court will first address Edwards's contention that the ALJ erred by failing to accord proper weight to the opinion of Dr. Vanover, a treating physician. (Plaintiff's Brief at 6-9.) After a review of the evidence of record, I find Edwards's

-25-

argument unpersuasive.

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[7] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In this case, Dr. Vanover first treated Edwards on January 26, 2007, at Stone Mountain, by referral from Wilma Deel, FNP. (R. at 262.) Deel referred Edwards to Dr. Vanover for a pain evaluation. (R. at 262.) Edwards reported that Vicodin that he had taken in the past was effective in controlling his pain, but his current prescription for Darvocet was not effective. (R. at 262.) Edwards also explained that

---

[7]*Hunter* was superceded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

ibuprofen controlled his pain; however, he expressed concerns about taking too much of the medication. (R. at 262.) A physical examination of the neck revealed marked tenderness of the paracervical muscles, as well as a possible marked decrease in Edwards's range of motion in the neck, secondary to pain. (R. at 262.) Dr. Vanover also noted tenderness in the upper thoracic back area that extended out to the shoulders. (R. at 262.) Edwards's range of motion of his arms was restricted, secondary to wrist pain. (R. at 262.) Dr. Vanover concluded that Edwards suffered from chronic cervical pain and advised him to continue his treatment regimen. (R. at 262.) Specifically, Dr. Vanover instructed Edwards to continue taking ibuprofen for control of moderate pain, but suggested that he take Vicoprofen for severe pain. (R. at 262.) Edwards also was advised to avoid lifting, straining, pushing and pulling, and it was recommended that he use heat treatments for his upper thoracic area and neck. (R. at 262.)

Edwards was again treated by Dr. Vanover on March 27, 2007. (R. at 261.) He reported that he was doing fairly well and explained that, although he continued to experience pain, he was doing much better, due in large part, to the Vicoprofen prescription. (R. at 261.) Edwards reported that he continued to be quite anxious, but indicated that he was coping much better. (R. at 261.) Upon examination, Dr. Vanover noted that there was marked tenderness of the cervical musculature and a decreased range of motion. (R. at 261.) Dr. Vanover diagnosed chronic anxiety disorder, hypothyroidism, chronic cervical pain, depression and benign prostatic hypertrophy. (R. at 261.) Edwards was continued on the same medications. (R. at 261.)

-27-

Edwards presented to Dr. Vanover at Stone Mountain on June 25, 2007. (R. at 260.) He again indicated that Vicoprofen had helped his pain, and he reported that he was able to attend to his activities of daily living and chores without undue difficulty. (R. at 260.) As such, he was much easier to get along with and his life was more pleasant. (R. at 260.) Edwards also reported that he was experiencing much less depression. (R. at 260.) A physical examination revealed tenderness in the paracervical muscles with a decreased range of motion of the neck. (R. at 260.) Dr. Vanover concluded that Edwards suffered from chronic cervical pain, hypothyroidism, hyperlipidemia and chronic depression. (R. at 260.)

The undersigned notes that Dr. Vanover's treatment notes contain findings that are not very restrictive in nature. Thus, even if controlling weight had been given to Dr. Vanover's medical opinion, the ALJ's residual functional capacity determination may not have been substantially altered. Moreover, in his brief, Edwards argues that "Dr. Vanover opined that Edwards is not able to perform SGA in an ordinary work setting on a regular and continuing basis (i.e. 8 hours a day, for 5 days a week or an equivalent work schedule)." (Plaintiff's Brief at 8.) However, as pointed out by the Commissioner, the record is devoid of such an opinion or statement that can be attributed to Dr. Vanover.

As such, the undersigned can assume only that, to support his assertion that Dr. Vanover found he was unable to perform substantial gainful activity in an ordinary work setting on a regular and continuing basis, Edwards is relying heavily upon Dr. Vanover's January 2007 recommendation, which advised him to avoid lifting, straining, pushing and pulling. (R. at 262.) Although Dr. Vanover's treatment notes

-28-

do not appear to suggest a complete restriction in the above-mentioned activities, Edwards apparently is contending that such findings equate to a total restriction and, thus, render him unable to work. Despite Edwards's argument, a thorough review of the evidence of record shows that any such interpretation of Dr. Vanover's findings should be dismissed, as those findings are inconsistent with the other medical evidence.

For example, Dr. Surrusco, a state agency physician, who completed a PRFC on March 14, 2006, and September 18, 2006, found that Edwards could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for about six hours in a typical eight-hour workday and sit for about six hours in a typical eight-hour workday. (R. at 184-89, 225-31.) Dr. Surrusco also found that Edwards was limited in his ability to push and/or pull with his upper extremities. (R. at 185, 226.) In addition, Dr. Surrusco indicated that Edwards was limited in his ability to reach in all directions, including overhead. (R. at 186, 227.) However, no additional manipulative limitations were reported. (R. at 186, 227.) In March 2006, Dr. Surrusco determined that Edwards could only occasionally climb, balance, stoop, kneel, crouch and crawl; however, in September 2006, Dr. Surrusco noted no postural limitations. (R. at 186, 227.) Edwards's allegation were found to be only partially credible. (R. at 189, 231.) Dr. Surrusco's March 2006 findings were affirmed by Dr. McGuffin, another state agency physician, on February 6, 2007. (R. at 229, 231.) Thus, although the state agency physicians did indeed limit Edwards to light work, they failed to place complete restrictions on Edwards's ability to lift, strain, push and pull. The record does not contain any other medical opinions or treatment notes referencing any additional

-29-

physical limitations on Edwards's ability to work.

Furthermore, the medical opinion upon which Edwards relies fails to include more restrictive findings than those noted in the state agency physicians' opinions, opinions which the ALJ gave great weight. (R. at 25.) While Dr. Vanover and the state agency physicians agreed that Edwards was limited in his ability to lift, push and/or pull, neither Dr. Vanover nor the state agency physicians explicitly placed total restrictions on his ability to perform those activities. Additionally, Dr. Vanover's recommendation that Edwards should avoid lifting, straining, pushing and pulling was offered during Edwards's first visit in January 2007. (R. at 262.) In each of Edwards's subsequent visits to Dr. Vanover, steady improvement was reported. (R. at 260-61.) Specifically, in March 2007, Edwards reported that he was doing fairly well, explaining that the Vicoprofen prescription had been beneficial. (R. at 261.) In June 2007, Edwards again reported that Vicoprofen had helped his pain, noting that he was able to attend to his activities of daily living and chores without undue difficulty. (R. at 260.) Dr. Vanover's treatment notes after the initial January 2007 visit mention no additional physical limitations.

It is readily apparent from the ALJ's written opinion that she considered the medical opinion of Dr. Vanover, a treating source. As discussed above, the undersigned is of the opinion that Dr. Vanover's findings revealed limitations no more restrictive than those noted by the state agency physicians. That being the case, even if the ALJ had accorded great weight to Dr. Vanover's medical opinions, I am of the opinion that the ALJ's residual functional capacity determination would not have changed. Nonetheless, in giving Edwards the benefit of the doubt, and assuming that

-30-

Dr. Vanover placed a total restriction on his ability to lift, strain, push and pull, the undersigned finds that such an opinion should not have been accorded great weight, as it was inconsistent with other substantial evidence. *See Craig*, 76 F.3d at 590. For the above-stated reasons, I find that the ALJ did not err by failing to accord controlling weight to the opinion of Dr. Vanover.

Next, Edwards argues that the ALJ erred by failing to give proper consideration to the opinion of Hamil, who completed a psychological evaluation at the request of Edwards's counsel. (Plaintiff's Brief at 9-10.) Edwards claims that the ALJ improperly substituted her opinions regarding his psychiatric impairments for those of a trained professional. (Plaintiff's Brief at 9-10.) While I disagree with Edwards's claim that the ALJ substituted her opinion for that of a trained professional, I am of the opinion that, considering the evidence before the court, the ALJ's decision to not fully accept Hamil's opinions is not supported by substantial evidence.

The undersigned recognizes the general rule that, "[i]n the absence of any psychiatric or psychological evidence to support [her] position, the ALJ simply does not possess the competency to substitute [her] views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). In this case, the record contains evidence of psychological treatment from Stone Mountain, a PRTF completed by state agency psychologist Jennings, a psychological evaluation performed by Hamil and a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) performed by Hamil.

-31-

The state agency opinion of Jennings, to which the ALJ accorded great weight, certainly supported the ALJ's decision. Jennings found that Edwards had a nonsevere medical impairment. (R. at 212-24.) Specifically, Jennings determined that Edwards suffered from an anxiety disorder, not otherwise specified, noting that the medically determinable impairment did not precisely satisfy the required diagnostic criteria. (R. at 217.) Jennings found that Edwards was mildly limited in his activities of daily living and in his ability to maintain social functioning. (R. at 222.) However, Jennings placed no limitations on Edwards's ability to maintain concentration, persistence or pace. (R. at 222.) Jennings also indicated that Edwards had not experienced any episodes of decompensation. (R. at 222.) She further found that Edwards's mental allegations were only partially credible. (R. at 224.) This assessment was affirmed by state agency psychologist Tenison, on February 5, 2007. (R. at 212.) As such, because the findings of Jennings and Tenison constitute psychological evidence in support of the ALJ's position, I conclude that the ALJ did not substitute her opinion as to Edwards's mental limitations for that of a trained professional, as the ALJ's decision was supported by other opinion evidence of record.

However, considering the evidence before the court, I am troubled by the rejection of the findings of Hamil. The ALJ found that Hamil's conclusions were "not fully supported by the evidence in file, the course of treatment, the medications, and the activities of daily living[]" and, thus, did not fully accept Hamil's findings. (R. at 25-26.) It is evident that Hamil's evaluation revealed numerous restrictions and/or limitations as to Edwards's mental capabilities. Hamil found Edwards's ability to concentrate and maintain attention to be limited, but noted that his short-term memory

-32-

appeared to be generally intact.  (R. at 237.)  Hamil opined that Edwards's intelligence was in the low average range, and he found Edwards's insight and judgment to be adequate.  (R. at 237.)

During the evaluation, Hamil administered the WAIS-III test, and Edwards obtained a verbal IQ score of 88, a performance IQ score of 91 and a full-scale IQ score of 89.  (R. at 237.)  Hamil explained that the disparity between Edwards's verbal and performance abilities was statistically significant, indicating that it reflected superior nonverbal and fluid reasoning relative to acquired verbal-related knowledge and verbal reasoning.  (R. at 237.)  He also found that Edwards's interpersonal skills were poor due to panic.  (R. at 239.)

In assessing Edwards's ability to perform work-related activities, Hamil indicated that Edwards exhibited a poor energy level.  (R. at 239.)  Hamil found that Edwards did not appear to be limited in his ability to understand, but explained that Edwards was moderately limited in his ability to remember general items and concepts because of apathy, anxiety and stress sensitivity.  (R. at 239.)  He further found that while Edwards was able to comprehend, it would be unreasonable to expect him to be able to follow more than simple job instructions and perform more than simple and repetitive tasks because of his memory problems.  (R. at 239.)

Hamil determined that Edwards's concentration and persistence were markedly inadequate to meet the demands of more than simple work-related decisions, which was attributed to Edwards's indecisiveness, panic and apathy.  (R. at 239.)  Edwards also exhibited a markedly unsatisfactory ability to interact with others.  (R. at 239.)

-33-

In particular, Hamil noted that Edwards would have a limited ability to accept instructions from supervisors and interact with co-workers and the public appropriately due to his panic attacks and feelings of guilt and worthlessness. (R. at 239.) Hamil found that Edwards did not possess the full ability to manage his own hygiene, and he also found that Edwards would, at times, need assistance in performing certain activities of daily living. (R. at 239.) In addition, as a result of panic attacks, stress sensitivity and apathy, Edwards was found to be extremely limited in his ability to do the following: deal with the usual stress encountered in competitive work; adapt to changes in the workplace; be aware of normal hazards; or take appropriate precaution. (R. at 239.) Hamil also concluded that Edwards's anxiety, mood and physical problems might extremely detract from his ability to do the following activities: maintain regular attendance; perform work activities on a consistent basis; perform work activities without special/additional supervision; and meet an employment schedule, i.e. completing a normal workday/workweek without interruption. (R. at 239.)

Hamil found Edwards's prognosis to be guarded, opining that mental health counseling and medication management by a psychiatrist would be in his best interests. (R. at 239.) Hamil diagnosed Edwards with, among other things, panic disorder with agoraphobia and depressive disorder, not otherwise specified. (R. at 239.) He also determined that Edwards isolated himself, avoided others and was dependent upon his spouse. (R. at 239.) Hamil concluded that Edwards had a then-current GAF score of 40. (R. at 239.)

Hamil also completed a Medical Source Statement Of Ability To Do Work-

Related Activities (Mental), finding that Edwards was markedly limited in his ability to understand, remember and carry out complex instructions and in his ability to make judgments on complex work-related decisions. (R. at 240-42.) Hamil found Edwards to be extremely limited in his ability to interact appropriately with supervisors, co-workers and the public. (R. at 241.) He further found that Edwards was extremely limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 241.)

Aside from the very restrictive findings of Hamil, the only remaining mental health-related evidence of record consists of the nonexamining state agency opinions of Jennings and Tenison and the behavioral health treatment received by Edwards at Stone Mountain from Burke. Notably, the psychological evaluation and Medical Source Statement Of Ability To Do Work-Related Activities (Mental) assessment were completed *after* the state agency opinions were rendered. Furthermore, according to the medical evidence of record, Edwards did not commence behavioral health treatment at Stone Mountain until February 28, 2007, which was more than one year after Jennings completed the PRTF. State agency psychologists Jennings and Tenison merely considered the treatment notes relating to Edwards's general care at Stone Mountain as of approximately October 2005, which included complaints of, and treatment for, anxiety and depression. (R. at 224.) Thus, the opinions of Jennings and Tenison, which were given great weight by the ALJ, were rendered without consideration of the findings of Hamil. That, coupled with the fact that the only other mental health evidence of record, i.e. the treatment notes from a licensed clinical social worker at Stone Mountain, does not constitute an opinion from an acceptable medical source under 20 C.F.R. §§ 404.1513, 416.913, strongly indicates that the

-35-

ALJ's rejection of Hamil's opinion is not supported by substantial evidence.

The record shows that Edwards consistently reported allegations of depression, stress and anxiety. The diagnoses and clinical assessments of record include chronic anxiety disorder, depression, chronic depression, symptoms characteristic of a major depressive disorder, an anxiety disorder, not otherwise specified, a GAF of 40, panic disorder with agoraphobia and depressive disorder, not otherwise specified. In addition, Edwards has been prescribed medications such as Prozac, Buspar and Wellbutrin to treat these conditions.

As such, because the evidence upon which the ALJ relied did not consider the findings of Hamil or the most recent behavioral health treatment notes from Stone Mountain, the ALJ's decision to give little weight to the opinion of Hamil is not supported by substantial evidence.

Based on my review of the record, and for the above-stated reasons, I find that substantial evidence does not exist in the record to support the ALJ's findings as to Edwards's mental limitations and their effect upon his work-related abilities. I recommend that the court deny Edwards's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand this case for further consideration.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now

submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the Commissioner's finding as to the weight accorded to Edwards's treating physician, Dr. Patricia Vanover, M.D.;

2.  Substantial evidence does not exist in the record to support the Commissioner's finding as to Edwards's mental limitations; and

3.  Substantial evidence does not exist in the record to support the Commissioner's finding that Edwards was not disabled.

## RECOMMENDED DISPOSITION

The undersigned recommends that this court deny Edwards's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand this case for further consideration.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636 (b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or

modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in the matter to the Honorable James P. Jones, Chief United States District Judge.

The clerk is directed to send copies of this Report and Recommendation to all counsel of record.

**DATED:** This 27th day of April 2009.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE